WMN:KKO
F. #2010R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INSTALLATION, USE,
MONITORING, REPAIR, REPLACEMENT AND
REMOVAL OF:

ONE MOBILE GPS TRACKING DEVICE IN OR ON
A BLACK 2005 PORSCHE CAYENNE S, VEHICLE
IDENTIFICATION NUMBER
WP1AB29P05LA65722, BEARING NEW YORK
LICENSE PLATE NUMBER DNM-1310 AND
REGISTERED TO JAMES WRENN; AND

ONE MOBILE GPS TRACKING DEVICE IN OR ON
A SILVER 2009 MERCEDES BENZ 350 SERIES,
VEHICLE IDENTIFICATION NUMBER
WDBUF56X29B370786, BEARING NEW YORK
LICENSE PLATE NUMBER 09WSC AND
REGISTERED TO STEVEN PUNTURIERI

FILE UNDER SEAL

AFFIDAVIT IN
SUPPORT OF APPLICATION

- - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

PETER SURETTE, being duly sworn, deposes and states as follows:

1.  I am a Special Agent of the Drug Enforcement Administration ("DEA") assigned to a Tactical Division Squad ("TDS") within the New York Field Division ("NYFD").

2.  I have participated in numerous investigations of unlawful drug distribution during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds and records of narcotics and money laundering transactions have been found;

(c) reviewed and analyzed numerous recorded conversations and records of drug traffickers and money launderers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education and experience, I have become familiar with (a) the manner in which controlled substances are illegally acquired, stored and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

3.    I submit this affidavit in support of an application for an order pursuant to Federal Rule of Criminal Procedure 41(b), Title 18, United States Code, Section 3117, and Title 28, United States Code, Section 1651, authorizing the installation and monitoring of two Global Positioning System ("GPS") mobile tracking devices to be installed by trained technicians, or authorized representatives of the DEA in or on each of the following two vehicles: (1) a black 2005 Porsche Cayenne S, VIN WP1AB29P05LA65722, bearing New York license plate number DNM-1310 and registered to James Wrenn ("SUBJECT VEHICLE #1"), and (2) a silver 2009 Mercedes Benz 350 series, VIN WDBUF56X29B370786, bearing New York license plate number 09WSC and registered to Steven Punturieri ("SUBJECT VEHICLE #2";

2

collectively, the "SUBJECT VEHICLES"), each of which is currently located in the Eastern District of New York, in order to monitor the movement of the SUBJECT VEHICLES (the "Requested Information"), for a period of forty-five (45) days.

    4.   I am familiar with the facts and circumstances of the investigation set forth below through discussions with other agents and officers of the DEA and other law enforcement agents, which includes information provided by a DEA confidential informant ("CI #1"); and from my review of records and reports relating to the investigation.[1]  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent, or law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.  Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such

---

    [1]    CI #1 has provided information in this investigation that has proven to be reliable and has been corroborated by independent evidence.  CI #1's criminal history includes a conviction for obtaining property by fraud.  CI #1 currently has pending New Jersey state narcotics charges stemming from a July 2010 arrest and hopes to have a reduction in his/her sentence in exchange for his/her cooperation.

surveillance. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the installation and use of GPS mobile tracking devices, I have not included details of every aspect of the investigation. Facts not set forth herein are not being relied on in reaching my conclusion that the requested orders should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

5. Probable cause exists to believe that the Requested Information will lead to evidence of offenses involving (1) the distribution of, and possession with intent to distribute, controlled substances, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841 and 846; and (2) laundering the proceeds of narcotics trafficking; conspiracy to do the same; and attempts to do the same, in violation of 18 U.S.C. §§ 1956 and 1957 (collectively, the "TARGET OFFENSES"), as well as the identification of individuals who are engaged in the commission of these offenses.

6. In addition, the Requested Information is relevant and material to an ongoing investigation.

7. For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by JAMES PASCALE, JAMES WRENN and STEVEN J. PUNTURIERI, and

4

others unknown. Further, there is probable cause to believe that PASCALE, WRENN, PUNTURIERI, and others unknown, intend to use the SUBJECT VEHICLES to commit the TARGET OFFENSES.

## PROBABLE CAUSE

8. Since September 2010, the TDS of the NYFD has been investigating a narcotics distribution ring operating in Staten Island. The investigation has revealed that the organization obtains and sells brand-name prescription drugs, including OxyContin and Xanax. Oxycodone, the active ingredient in OxyContin, is a Schedule II controlled substance. Alprazolam, the active ingredient in Xanax, is a Schedule IV controlled substance.

9. JAMES PASCALE first came to the attention of DEA agents in New York through CI #1 who began cooperating with the DEA in October 2010. CI #1 identified JAMES PASCALE as a distributor of OxyContin and Xanax based in Staten Island, New York. CI #1 stated, in sum and substance, that it is his/her understanding that PASCALE obtains the narcotics from friends who obtain prescriptions for brand-name prescription drugs from multiple doctors, fill the prescriptions, and deliver the pills to PASCALE's residence in Staten Island, New York. CI #1 further stated, in sum and substance, that PASCALE sells the narcotics from his residence. This information was corroborated by subsequent events, as explained below.

5

10.   During the course of the investigation, the DEA directed CI #1 to conduct three purchases of OxyContin 80mg tablets from PASCALE.  During these purchases, DEA agents observed WRENN and PUNTURIERI driving their vehicles, SUBJECT VEHICLE #1 and #2, respectively, to PASCALE's residence to supply the narcotics.

## Use of SUBJECT VEHICLE #1 to Deliver Narcotics on October 20, 2010

11.   On October 20, 2010, at approximately 4:00 p.m., CI #1 advised DEA agents, in sum and substance, that pursuant to their instructions, he/she had negotiated a purchase from PASCALE of 100 OxyContin 80mg tablets, for $2,000 ($20 per pill) via text message to PASCALE's cellular telephone.

12.   CI #1 advised DEA agents, in sum and substance, that during the negotiation PASCALE requested that CI #1 send him a text message when he/she was 45 minutes away so PASCALE could coordinate with his source to drop off the pills before CI #1 arrived.

13.   On the same day, at approximately 4:30 p.m., in anticipation of a monitored narcotics purchase by CI #1 from PASCALE to take place later that day, DEA agents searched CI #1 and CI #1's vehicle for contraband and confirmed that he/she did not possess any contraband.

14.   On the same day, at approximately 4:45 p.m., pursuant to DEA instructions and under observation by DEA agents,

6

CI #1 sent a text message to PASCALE to advise PASCALE that he/she was 45 minutes away.  At the same time, DEA agents established surveillance in the vicinity of 68 Elder Avenue, Staten Island, New York, which is PASCALE's residence as listed in the subscriber information for his cellular telephone ("residence").

15.  On the same day, at approximately 5:15 p.m., DEA agents provided CI #1 with $2,000 in pre-recorded U.S. currency and a digital audio recorder to record the anticipated narcotics transaction.

16.  On the same day, at approximately 5:25 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent another text message to PASCALE to advise PASCALE that he/she was five minutes away.

17.  On the same day, at approximately 5:30 p.m., DEA agents observed that CI #1 was receiving a call from PASCALE's cellular telephone number on his/her cellular telephone.  At the same time, DEA agents conducting surveillance of the residence observed a white male, subsequently identified as PASCALE, standing near the front of the residence holding a cellular telephone to his ear.  DEA agents directed CI #1 to answer the call.  CI #1 answered the call and advised the caller, in sum and substance, that he/she was close by.  After CI #1 ended the call, DEA agents conducting surveillance of the residence observed

7

PASCALE remove the cellular telephone from his ear. CI #1 advised agents, in sum and substance, that the person with whom he/she spoke was PASCALE.

18. On the same day, at approximately 5:31 p.m., DEA agents conducting surveillance of the residence observed SUBJECT VEHICLE #1 driving on Elder Avenue. SUBJECT VEHICLE #1 parked on the street close to the residence. A white male, subsequently identified as JAMES WRENN, exited SUBJECT VEHICLE #1 and walked towards the residence.

19. On the same day, at approximately 5:35 p.m., DEA agents followed CI #1 in CI #1's vehicle to the vicinity of the residence. DEA agents observed CI #1 arrive at the residence at approximately 5:42 p.m., park his/her vehicle in the vicinity of the residence, exit the vehicle and walk toward the basement apartment of the residence. At approximately 5:43 p.m., DEA agents observed CI #1 walk from the residence back to his/her vehicle, enter the vehicle and depart the area. DEA agents followed CI #1's vehicle to a predetermined meeting location more than a mile away where CI #1 provided the agents with 100 round green pills, identified by agents as 100 OxyContin 80mg tablets, and the digital audio recorder. DEA agents again searched CI #1 and CI #1's vehicle for additional contraband and confirmed that CI #1 did not possess any additional contraband.

8

20. CI #1 stated, in sum and substance, that he/she walked up to the door of the residence, entered PASCALE's apartment and observed PASCALE, a female he/she recognized as PASCALE's girlfriend and another male inside who he/she recognized from previous narcotics activity with PASCALE. CI #1 further advised DEA agents, in sum and substance, that after greetings were exchanged, CI #1 provided PASCALE with the $2,000 in pre-recorded U.S. currency and in exchange PASCALE gave CI #1 100 OxyContin 80mg tablets. CI #1 further advised DEA agents, in sum and substance, that PASCALE informed CI #1 that he had 120 "blues," meaning 120 OxyContin 30mg tablets (which are blue in color) that he wanted to sell to CI #1. CI #1's information was corroborated by the digital audio recording of the meeting.

21. At approximately 5:52 p.m., DEA agents conducting surveillance of the residence observed PASCALE and WRENN exit the residence and stand next to SUBJECT VEHICLE #1 talking. Shortly thereafter, DEA agents observed WRENN enter SUBJECT VEHICLE #1 and depart the area.

Use of SUBJECT VEHICLE #2 to Deliver Narcotics on November 3, 2010

22. Beginning on October 25, 2010, pursuant to instructions from DEA agents, CI #1 negotiated the purchase of 100 OxyContin 80mg tablets from PASCALE for $2,000 in U.S. currency from PASCALE.

9

23. On November 3, 2010 at approximately 4:30 p.m., DEA agents met CI #1 in preparation for the transaction. At that time, CI #1 presented his/her cellular telephone which showed messages in its incoming and outgoing message logs discussing a possible additional transaction for 100 OxyContin 30mg tablets for $1,150. CI #1 explained to DEA agents, in sum and substance, that PASCALE charges CI #1 $11.50 per tablet. In the messages, CI #1 advised PASCALE, in sum and substance, that he/she was not interested because he/she already had OxyContin 30mg tablets for distribution.

24. On November 3, 2010, at approximately 4:30 p.m., DEA agents searched CI #1 and CI #1's vehicle for contraband with negative results. At the same time, other DEA officers established surveillance in the vicinity of PASCALE's residence.

25. On the same date, at approximately 4:47 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent another text message to PASCALE stating that he/she was "15 mins out".

26. On the same date, at approximately 5:03 p.m., CI #1 placed a consensually recorded call to PASCALE. During the telephone call, CI #1 advised PASCALE, in sum and substance, that he/she was five minutes away. PASCALE stated, in sum and substance, that he was waiting for CI #1 and "his boy," who should be arriving coincident with CI #1.

10

27.   On the same date, following the recorded telephone conversation between CI #1 and PASCALE, DEA agents equipped CI #1 with a digital audio recording device and provided CI #1 with pre-recorded buy money to purchase OxyContin 80mg tablets.   DEA agents them followed CI #1 while he/she drove his/her vehicle to the vicinity of the residence.

28.   On the same date, at approximately 5:10 p.m., DEA agents observed CI #1 park his/her vehicle in the vicinity of the residence, exit his/her vehicle and walk towards PASCALE, who was then standing next to a white Mercedes-Benz.   In the preceding half-hour, agents had observed PASCALE walking back and forth between the residence and the Mercedes-Benz four times and placing items in the trunk of the vehicle.   DEA agents then observed PASCALE and CI #1 walk from the Mercedes-Benz towards the residence.

29.   On the same date, at approximately 5:16 p.m., CI #1 sent a text message to DEA agents.   CI #1 wrote: "waiting for boy.5 mins".

30.   On the same date, at approximately 5:18 p.m., CI #1 sent a text message to DEA agents.   CI #1 wrote: "Boys almost here."

31.   On the same date, at approximately 5:20 p.m., DEA agents observed SUBJECT VEHICLE #2 park near the residence on Elder Avenue.   A male, later identified as PUNTURIERI, exited the

11

vehicle and walked towards the residence.  PASCALE, PUNTURIERI

and CI #1 then exited the residence.  DEA agents witnessed

PUNTURIERI count cash while all three walked towards the white

Mercedes-Benz.

32.  On the same date, at approximately 5:22 p.m., DEA

agents observed CI #1 depart in CI #1's vehicle.  DEA agents

followed CI #1 to a predetermined location within a few miles of

PASCALE's residence where CI #1 provided the agents with 100

round green pills, identified by agents as 100 OxyContin 80mg

tablets, and the digital audio recorder.  DEA agents then

searched CI #1 and the CI #1's vehicle for contraband with

negative results.

33.  CI #1 then described his/her meeting with PASCALE,

in sum and substance, to the DEA agents as follows.  PASCALE

showed CI #1 his newly leased white Mercedes-Benz after he/she

arrived. CI #1 then went inside PASCALE's basement apartment and

observed PASCALE's girlfriend sleeping on a couch. CI #1 provided

the pre-recorded buy money to PASCALE. PASCALE informed CI #1, in

sum and substance, that he would give CI #1 a better price if

he/she purchased larger quantities. PASCALE further advised CI

#1, in sum and substance, that he has a source for gallon

quantities of "GHB" and has "HGH".[2]  A short time later, PASCALE

---

[2]     GHB stands for Gamma-Hydroxy-Butyrate and is a Schedule
I controlled substance. HGH stands for Human Growth Hormone and is
a substance that is regulated by the Food and Drug Administration.

and PUNTURIERI met directly outside the apartment where CI #1
observed PASCALE give PUNTURIERI money. PASCALE then handed CI
#1 a bag containing the 100 round green pills. PASCALE,
PUNTURIERI and CI #1 exited the residence and walked towards the
white Mercedes-Benz. The agents' observations and digital audio
recording corroborate CI #1's description of the meeting with
PASCALE and PUNTURIERI.

34. On the same date, at approximately 5:23 p.m., DEA
agents observed PASCALE and PUNTURIERI enter the white Mercedes-
Benz. At approximately 5:31 p.m., DEA agents observed PASCALE
and PUNTURIERI exit the white Mercedes-Benz. PASCALE then
returned to the residence and PUNTURIERI entered SUBJECT VEHICLE
#2 and departed. Surveillance was maintained on PUNTURIERI until
he arrived at 14 Dorval Avenue, Staten Island, New York, where
PUNTURIERI resides.

Use of SUBJECT VEHICLE #2 to Deliver Narcotics on December 9,
2010

35. Beginning on December 7, 2010, pursuant to
instructions from DEA agents, CI #1 negotiated the purchase of
150 OxyContin 80mg tablets from PASCALE.

36. The following messages were exchanged on December
7, 2010 in furtherance of this controlled purchase and were
subsequently reviewed by DEA agents on CI #1's cellular
telephone.

13

a. At approximately 6:57 p.m., CI #1 sent the following text message to PASCALE: "Hey man. Whats good. Giants tiks section 150 for Thursday. Wouldd they be available". CI #1 previously advised agents that "Giants tickets" was PASCALE's current code for OxyContin 80mg tablets and "section" numbers referred to the number of tablets requested. Thus, CI #1 was asking PASCALE to sell him/her 150 OxyContin 80mg tablets.

b. At approximately 7:20 p.m., PASCALE responded with the following text message to CI #1's cellular telephone: "150%".

c. At approximately 7:26 p.m., CI #1 sent the following text message to PASCALE: "Ok get it set up".

37. CI #1 and PASCALE exchanged additional messages on December 7, 2010, December 8, 2010 and December 9, 2010 confirming that they would meet on December 9, 2010 at 5:30 p.m. to conduct the transaction.

38. The following messages were exchanged on December 9, 2010 in furtherance of the same controlled purchase of 150 OxyContin 80mg tablets and were subsequently reviewed by DEA agents on CI #1's cellular telephone:

a. At approximately 4:21 p.m., CI #1 sent the following text message to PASCALE: "Should I hit u up 20 out". CI #1 explained that. In this message, he/she was asking PASCALE

14

whether CI #1 should contact PASCALE when he/she was 20 minutes away.

        b.    At approximately 4:21 p.m., PASCALE responded by text message to CI #1's telephone: "Yea I'm good 2 go".

        c.    At approximately 4:22 p.m., CI #1 sent the following text message to PASCALE: "Ok".

    39.   On December 9, 2010 at approximately 4:42 p.m., DEA agents monitored a judicially-authorized live video pole camera near PASCALE's residence. Agents observed SUBJECT VEHICLE #2 arrive and park on Elder Avenue. Agents observed a male, later determined to be PUNTURIERI exit SUBJECT VEHICLE #2 and walk towards PASCALE's residence. After a few minutes, PUNTURIERI returned to SUBJECT VEHICLE #2 while operating a cellular telephone. PUNTURIERI and SUBJECT VEHICLE #2 were previously observed in connection with the controlled purchased of 100 OxyContin 80mg tablets from PASCALE conducted by CI #1 on November 3, 2010.

    40.   On December 9, 2010, at approximately 4:46 p.m., DEA agents met with CI #1 in preparation for a purchase of 150 OxyContin 80mg tablets for $3,000.00 in pre-recorded buy money from PASCALE at the residence. At approximately 5:00pm, DEA agents searched CI #1 and CI #1's vehicle for contraband with negative results.

41. On the same date, at approximately 5:01 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent the following text message to PASCALE: "I'm 20 away".

42. On the same date, at approximately 5:01 p.m., PASCALE responded by text message to CI #1's telephone while agents were monitoring CI #1's telephone. PASCALE wrote: "Kk".

43. On the same date, at approximately 5:23 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 placed a digitally recorded telephone call to PASCALE to advise PASCALE in sum and substance, he/she was three minutes away. CI #1 reached PASCALE's voicemail but was instructed by DEA agents not to leave a message.

44. On the same date, at approximately 5:24 p.m., PASCALE called CI #1's telephone and DEA agents digitally recorded the call. During the recorded call CI #1 advised PASCALE, in sum and substance, that he/she was three minutes away and PASCALE responded that CI #1 could "just come on in." CI #1 informed DEA agents, in sum and substance, that he/she recognized PASCALE's voice during the call. DEA agents then equipped CI #1 with a digital audio recording device and provided CI #1 with pre-recorded buy money for the purchase of OxyContin.

45. On the same date, at approximately 5:29 p.m., DEA agents followed CI #1 while CI #1 drove in his/her vehicle to the vicinity of PASCALE's residence. At approximately 5:32 p.m., DEA

16

agents observed CI #1 park CI #1's vehicle and walk towards the residence. At approximately 5:38 p.m., DEA agents observed CI #1 return to CI #1's vehicle and depart. DEA agents followed CI #1's vehicle to a predetermined location within a few miles from PASCALE's residence where CI #1 provided agents with 147 round green pills and the digital audio recorder. DEA agents then searched CI #1 and CI #1's vehicle for contraband with negative results.

46. CI #1 then described his/her meeting with PASCALE, in sum and substance, to the DEA agents as follows. PASCALE showed CI #1 his new hardwood floors and furniture. PASCALE mentioned the recent arrest of a doctor in Staten Island who was writing prescriptions for OxyContin while knowing the patients were providing him with false X-rays. CI #1 provided PASCALE with the pre-recorded buy money after which PASCALE told CI #1 that he removed three pills. Since neither CI #1 nor PASCALE had any change, PASCALE told CI #1 he would make up the difference on the next purchase.

## GPS DATA

47. I have confirmed with DEA technicians that the GPS mobile tracking device can be installed within the SUBJECT VEHICLES. The devices, once installed and rendered operable, generate signals that fix the geographic positions of the SUBJECT VEHICLES. The signals are then read by a satellite that

17

transmits the location information in a form that a DEA computer program is able to calculate and project upon a map.

## GROUNDS FOR DELAYING NOTICE

48. Pursuant to 18 U.S.C. § 3103a and 18 U.S.C. § 2705(a)(2), and to the extent applicable, the government seeks authorization to delay notification to the registered owners of the SUBJECT VEHICLES until 30 days from the date on which the order proposed herein expires. The grounds for this request are as follows: the investigation of PASCALE, WRENN, PUNTURIERI and others is in its early stages and is expected to continue for several months. Disclosure of the warrant at this time would cause premature termination of the investigation into PASCALE, WRENN, PUNTURIERI and others in PASCALE's organization, most definitely cause members of the organization to cease using their vehicles, change telephone numbers that are being or will be be monitored through subpoenas, judicially authorized pen registers and potential wiretaps, cease using PASCALE's residence for transactions, and potentially to flee.

## AUTHORIZATION REQUESTED

49. Based on the foregoing, your affiant believes that the Requested Information will lead to evidence of criminal activities by PASCALE, WRENN, PUNTURIERI and others, to include the transportation or distribution of narcotics and narcotics-related proceeds as well as to the identification of individuals

18

who are engaged in the commission of those and related crimes.
The Requested Information is necessary in order to determine the
exact location of the SUBJECT VEHICLES so that law enforcement
agents can: (a) monitor the movements of the SUBJECT VEHICLES
when they moves about, and/or depart the Eastern District of New
York; (b) track the SUBJECT VEHICLES' travel without the need for
close proximity vehicle surveillance; and (c) identify locations
where the SUBJECT VEHICLES are taken to obtain or fill
prescriptions for narcotics and store narcotics, as well as to
identify the final locations where narcotics or narcotics
proceeds are delivered. This will allow law enforcement agents
to observe, and potentially arrest, those individuals, including
PASCALE, WRENN, PUNTURIERI and others who will use the SUBJECT
VEHICLES to commit the TARGET OFFENSES.

50. WHEREFORE, pursuant to Federal Rule of Criminal
Procedure 41(b), Title 18, United States Code, Section 3117, and
Title 28, United States Code, Section 1651, it is requested that
the Court issue a warrant and Order authorizing the installation
and monitoring of one GPS mobile tracking devices in or on
SUBJECT VEHICLE #1 and one GPS mobile tracking devices in or on
SUBJECT VEHICLE #2 by trained DEA technicians or by an individual
or individuals working under their direct supervision in order to
monitor the movement of the SUBJECT VEHICLE for a period of
forty-five (45) days.

51.  IT IS FURTHER REQUESTED that the Court authorize technicians and agents with the DEA or their authorized representatives to monitor the signals from the GPS mobile tracking devices installed within the SUBJECT VEHICLES for a period of forty-five (45) days following the issuance of the Court's Order, including signals produced inside private locations, and other places not open to the public or visual surveillance, and signals produced in the event that the SUBJECT VEHICLES leave the Eastern District of New York, but remain within the United States.

52.  IT IS FURTHER REQUESTED that the Court authorize technicians and agents with the DEA or an individual or individuals operating under their direct supervision to surreptitiously access the SUBJECT VEHICLES in the Eastern District of New York in order to repair, replace or remove the GPS mobile tracking devices including in the event the SUBJECT VEHICLES travel to private locations, other places not open to the public or visual surveillance, and in the event that the SUBJECT VEHICLES leave the Eastern District of New York, but remain within the United States.

53.  IT IS FURTHER REQUESTED that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the

20

safety of agents and others, except that working copies should be made available to the United States Attorney's Office, the DEA, and any other law enforcement agency designated by the United States Attorney's Office, and that the Court require the return of this warrant – and any notification required under 18 U.S.C. § 3103a and 18 U.S.C. § 2705(a)(2) – to occur within 30 days after the use of the tracking device has ended unless extended by the Court for good cause shown.

Dated:     Brooklyn, New York
         January 18, 2011

PETER SURETTE
Special Agent
Drug Enforcement Administration

Sworn before me this
18th day of January, 2011

THE HONORABLE ANDREW L. CARTER
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

21

KKO
F. #2010R02094
- - - - - - - - - - - - - - - - - -  **WSC. 11-031##**

IN THE MATTER OF AN APPLICATION OF
THE UNITED STATES OF AMERICA FOR AN
ORDER AUTHORIZING THE INSTALLATION,
USE, MONITORING, REPAIR, REPLACEMENT
AND REMOVAL OF:

**SEALED ORDER**

ONE MOBILE GPS TRACKING DEVICE IN OR
ON A BLACK 2005 PORSCHE CAYENNE S,
VEHICLE     IDENTIFICATION     NUMBER
WP1AB29P05LA65722, BEARING NEW YORK
LICENSE PLATE NUMBER DNM-1310 AND
REGISTERED TO JAMES WRENN; AND

ONE MOBILE GPS TRACKING DEVICE IN OR
ON A SILVER 2009 MERCEDES BENZ 350
SERIES, VEHICLE IDENTIFICATION NUMBER
WDBUF56X29B370786, BEARING NEW YORK
LICENSE    PLATE    NUMBER    09WSC    AND
REGISTERED TO STEVEN PUNTURIERI
- - - - - - - - - - - - - - - - - - - -X

Application having been made by the United States for

an Order pursuant to 18 U.S.C. § 3117, 28 U.S.C. § 1651, and

Federal Rule of Criminal Procedure 41, authorizing the

installation and monitoring of two Global Positioning System

("GPS") mobile tracking devices to be installed by trained

technicians, or authorized representatives of the DEA in or on

each of the following two vehicles: (1) a black 2005 Porsche

Cayenne S, VIN WP1AB29P05LA65722, bearing New York license plate

number DNM-1310 and registered to James Wrenn ("SUBJECT VEHICLE

#1"), and (2) a silver 2009 Mercedes Benz 350 series, VIN

WDBUF56X29B370786, bearing New York license plate number 09WSC

and registered to Steven Punturieri ("SUBJECT VEHICLE #2";

collectively, the "SUBJECT VEHICLES") currently located in the

Eastern District of New York, in order to monitor the movement of the SUBJECT VEHICLES (the "Requested Information"), for a period of forty-five (45) days;

The Court finds that there is probable cause to believe that the Requested Information will lead to evidence of violations of Title 21, United States Code, Sections 841 and 846,among other offenses, as well as to the identification of individuals who are engaged in the commission of these offenses.

IT IS HEREBY ORDERED pursuant to 18 U.S.C. § 3117, 28 U.S.C. § 1651, and Federal Rule of Criminal Procedure 41, that technicians and agents with the DEA may monitor the signals from the GPS mobile tracking device installed within the SUBJECT VEHICLES for a period of forty-five (45) days following the issuance of the Court's Order, including signals produced inside private locations, and other places not open to the public or visual surveillance, and signals produced in the event that either of the SUBJECT VEHICLES leaves the Eastern District of New York, but remains within the United States.

It is further ORDERED that technicians and agents with the DEA or an individual or individuals operating under their direct supervision to surreptitiously access the SUBJECT VEHICLES in the Eastern District of New York in order to repair, replace or remove the GPS mobile tracking devices including in the event that either of the SUBJECT VEHICLES travels to private locations,

-2-

other places not open to the public or visual surveillance, and in the event that either of the SUBJECT VEHICLES leaves the Eastern District of New York, but remains within the United States.

It is further ORDERED that the Court's Order and the accompanying Affidavit submitted in support thereof, as they reveal an ongoing investigation, be sealed until further Order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others, except that copies of the Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers as necessary to effectuate the Court's Order.

It is further ORDERED that this warrant be returned to the U.S. Magistrate Judge on criminal duty in the Eastern District of New York within 30 days after the use of the tracking device has ended as required by law.  Notice of the execution of this warrant otherwise required by Fed. R. Crim. P. 41 may be extended by the Court for good cause shown.

-3-

It is further ORDERED that, pursuant to 18 U.S.C.
§§ 2705(a)(2) and 3103(a), service of notice may be delayed for a
period of thirty (30) days after the use of the tracking device
has ended unless extended by the Court for good cause shown.


Dated:     Brooklyn, New York
           January 18, 2011


THE HONORABLE ANDREW L. CARTER
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

-4-